**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

FILED

2019 MAR 19 P 12: 58

U.S. DISTRICT COURT
NEW HAVEN, CT.

| | |
|---|---|
| **JANE DOE,** : | **CIVIL ACTION NO.:** |
| : | |
| **Plaintiff,** : | 3:19cv418(MPS) |
| : | |
| **v.** : | |
| : | |
| **CENTRAL CONNECTICUT STATE** : | |
| **UNIVERSITY, CURTIS LOLLAR,** : | |
| **GREGORY SNEED, EDWARD** : | |
| **DERCOLE, CHRISTOPHER** : | |
| **CERVONI, RAMON BAEZ, in their** : | |
| **individual capacities,** : | |
| : | |
| **Defendants.** : | **March 19, 2019** |

**COMPLAINT**

## I.   INTRODUCTION

1.      This is a case about abject institutional failure at Central Connecticut State University ("CCSU") that resulted in repeated acts of unspeakable sexual violence by one CCSU police officer against another, Officer Jane Doe.

2.      To perpetrate this institutional failure, CCSU:

a.      Hired police officers with "red flags" in their backgrounds;

b.      Chose to allow those officers — and their supervisors — to routinely make sexually graphic comments in the workplace about the female students they were tasked to protect and about their coworker, Officer Jane Doe;

c.      Failed to protect Officer Doe from officers and supervisors who repeatedly touched her breasts and buttocks in the workplace;

    d.      Decided not to discipline the officers who created this sexualized work environment;

    e.      Chose to leave these officers largely unsupervised, allowing their harassing conduct to escalate unfettered;

    f.      Decided to allow a sexual predator to continue working alongside the officer he sexually assaulted;

    g.      Decided not to investigate the acts of sexual violence after Officer Doe reported them to her lieutenant, who in turn reported them to the police chief;

    h.      Allowed the CCSU Office of Diversity and Equity — to which Officer Doe complained — to use abusive interrogation tactics; and

    i.      Permitted Officer Doe's coworkers and supervisors to retaliate against her, including by publicly humiliating her and leaving her without back-up when she needed it.

3.      CCSU continued this course of conduct until Officer Doe suffered from such severe mental and physical distress that she could no longer work.

4.      CCSU's institutional failure continues to this day, with its decision to allow its police chief, lieutenants and sergeants to remain in their leadership roles.

## II.    <u>JURISDICTION AND VENUE</u>

5.      The Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331.

6.      Venue is proper in this District under 28 U.S.C. § 1391(b)(2), because the events or omissions giving rise to the asserted claims occurred herein.

7.     This Court has supplemental jurisdiction over the plaintiff's state law claims, pursuant to 28 U.S.C. § 1367, because they form part of the same case or controversy as the federal law claims.

III.    **PARTIES**

8.     The plaintiff, Officer Jane Doe, resides in Connecticut.

9.     Officer Doe is female.

10.     Officer Doe demands a jury trial on all claims so triable.

11.     Defendant Central Connecticut State University ("CCSU" or "the University") is a public university located in New Britain, Connecticut.

12.     Defendant Curtis Lollar was an officer employed by Defendant CCSU in its Police Department ("the Department" or "the Force") during all relevant times herein.

13.     Defendant Gregory Sneed is and was a police chief employed by Defendant CCSU in its Police Department during all relevant times herein.

14.     Defendant Edward Dercole is and was a lieutenant employed by Defendant CCSU in its Police Department during all relevant times herein.

15.     Defendant Christopher Cervoni is and was a lieutenant employed by Defendant CCSU in its Police Department during all relevant times herein.

16.     Defendant Ramon ("Ray") Baez is and was an officer and then a sergeant employed by Defendant CCSU in its Police Department during all relevant times herein.

17.     At all relevant times discussed herein, CCSU was Officer Doe's employer within the meaning of Title VII of the Civil Right Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the Connecticut Fair Employment Practices Act (the "CFEPA"), Conn. Gen. Stat. § 46a-60 *et seq*.

18.     CCSU employs more than 15 employees.

19.     CCSU is an education program or activity that receives federal financial assistance within the meaning of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681.

## IV.   EXHAUSTION OF ADMINISTRATIVE REMEDIES

20.     Concurrently with the filing of this Complaint, the plaintiff will be filing a complaint with the Connecticut Commission on Human Rights and Opportunities ("CHRO"), alleging sex discrimination and retaliation.  The CHRO complaint will be dual filed with the federal Equal Employment Opportunity Commission ("EEOC").

21.     The CHRO complaint will be filed in a timely manner insofar as it will be filed within 180 days of the defendants' last discriminatory acts against the plaintiff.

22.     The plaintiff will seek a Release of Jurisdiction from the CHRO and EEOC and, if received, will move for leave to amend this Complaint to add claims under Title VII of the federal Civil Rights Act, 42 U.S.C. § 2000e *et seq.*, and the Connecticut Fair Employment Practices Act, Conn. Gen. Stat. § 46a-60 *et seq.*

23.     Separately, concurrently with the filing of this Complaint, the plaintiff will be filing a complaint with the Connecticut Office of the Claims Commissioner alleging common law claims against the defendants.

24.     If the plaintiff receives permission to file such common law claims, she will move for leave to amend this Complaint to add claims for negligent hiring, negligent supervision, and negligent retention.

## V.   STATEMENT OF FACTS

25.     Police Officer Curtis Lollar raped fellow Police Officer Jane Doe on multiple occasions during their employment together on CCSU's Police Force.  These rapes were the inevitable byproduct of the hostile work environment to which CCSU subjected her.  That

4

environment infected the entire Force and included not only her fellow officers' graphic comments about her body and the bodies of CCSU's female students, but also the repeated groping of Officer Doe's breasts and buttocks.  The environment was exacerbated by the Department's longstanding, male-dominated work environment; its history of employing police officers with "red flags"; and its consistent failure to provide oversight over and structure to the Force.

26.     After Officer Doe reported the rapes to her lieutenant, CCSU did nothing to investigate her allegations, let alone to protect her from the rapist whom it continued to employ. Instead, CCSU officers and sergeants retaliated against Officer Doe by delaying and failing to respond to her calls for back-up, hyper-criticizing her written reports, and prohibiting her from riding with her partner, her only ally on the Force.

27.     As the trauma and stresses from her toxic work environment mounted, Officer Doe reported the rapes again, this time to CCSU's Office of Diversity and Equity ("ODE").  Far from treating Officer Doe with the sensitivity her report required or even investigating her serious allegations in a neutral manner, the ODE investigator harassed Officer Doe, defended the rapist (Officer Lollar), and unnecessarily subjected Officer Doe to two different interviews in which the same questions were repeatedly asked and answered, thus forcing her to needlessly relive the rapes.

28.     As a result of the extreme sexual harassment (including three rapes), CCSU's retaliation against Officer Doe for reporting it, and CCSU's deliberately indifferent response to those reports, Officer Doe has been diagnosed with post-traumatic stress disorder and is currently on unpaid medical leave to address this serious health condition.

**A.**     **Officer Jane Doe Brings Her Experience in the Military and Law
Enforcement to the CCSU Police Force, Quickly Making a Positive
Impression on Campus.**

29.     A veteran of the U.S. military and a graduate of the Connecticut Police Academy,

Officer Jane Doe started her career in law enforcement as a police officer with an agency of the

Connecticut state government.  While she enjoyed her work for the agency, the prospect of joining

CCSU's Police Department appealed to her because, ██████████████████████████████████

████████████, Officer Doe felt a university police force would be a perfect fit for her skills and

interests.

30.     In 2010, Officer Doe applied for and was accepted to a position as an officer with

the CCSU Police Department.  From the outset, Officer Doe took her duties as a campus police

officer extremely seriously.  Every day, she sought to preserve the safety of the CCSU campus,

utilizing the community policing approach of engaging with students, faculty, and staff.  Her

positive impact soon became widely known throughout campus — and not just for her police work.

██████████████████████████████████████████████████████████████████████████████

█████████████████████████.  And students and staff frequently asked that Officer Doe serve as

the on-duty police officer at their organized events.

**B.**     **The CCSU Police Department Creates a Pervasive and Severely Hostile
Work Environment.**

31.     When Officer Doe joined the CCSU Police Force, the Department had 28 officers.

██████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████

████████████████████████████.

32.     Officer Doe's partner, who is male, euphemistically described the Department as a

"good old boys" network.  Indeed, for many of the male officers, the sexualization and

6

objectification of women was second-nature. For example, officers made repeated, graphic references to the breasts and buttocks of female students. Officer Doe's partner reported that his male colleagues regularly asked each other in the presence of Officer Doe: "Did you see what [a certain female student] is wearing today?," or "Did you see the camel toe on [another female student] today?" They also openly discussed the women they wanted to "get with." The male officers made these comments during the mandatory daily roll call which meant that Officer Doe had no choice but to hear them. Not surprisingly, this pervasive misogyny left her feeling humiliated, intimidated, and isolated.

33.     The sexist environment at CCSU was not entirely homegrown. CCSU hired several officers, including Officer Lollar, after they retired from the Hartford Police Department. Bernard Sullivan, CCSU's Assistant to the President for Safety, recently identified at least five individuals on CCSU's force "whose hiring I consider questionable." One of those "questionable" hires was Officer Lollar, whom CCSU recruited despite his long disciplinary history with the Hartford Police Department, including an arrest and a 56-day suspension.

34.     CCSU also had a policy of appointing an officer with greater seniority as the "officer in charge" of a shift, rather than staffing each shift with a supervisor. The Department's failure to ensure a supervisor's presence on every shift increased the opportunity for officers to engage in discriminatory acts without repercussions. On many occasions, CCSU appointed Officer Lollar as the "officer in charge" over Jane Doe.

**C.     The Officers and Even Their Supervisor Sexually Harass CCSU's Female Students.**

35.     The officers' sexualized comments were not limited to officer-only gatherings like the daily roll call. While out on "the beat," Officer Lollar, Officer Ray Baez, and Officer Joseph Magarolas routinely sexually harassed CCSU's female students. These three officers regularly

called out to female students: "Hey, how you doin'?" (They never greeted male students this way.) The officers freely commented on the female students' bodies, saying, in substance: "Oh look at that ass," or "Look at you. Look at that behind."

36.    Lieutenant Edward Dercole — who supervised the patrolmen — witnessed his officers make such comments while "on the beat." But he never did or said anything to stop them. To the contrary, on one occasion when Officer Doe was speaking with Lieutenant Dercole, he stared at a young female student who was running. In apparent reference to the student's bouncing breasts, Lieutenant Dercole said to Officer Doe: "I'm glad I was wearing my glasses. That just made my day."

37.    Upon information and belief, multiple female students complained to CCSU's Director of Student Wellness Services, Marisol Ostrov, about CCSU officers' sexually harassing comments. Still, the harassment continued.

**D.    The Officers and Even Their Supervisor Sexually Harass Officer Doe, Including Propositioning Her for Sex.**

38.    Officer Doe was not just a bystander to the pervasive sexual harassment; she was also its principal target. Almost from the outset of Officer Doe's employment, a group of male officers subjected her to sexualized comments and gestures. As Officer Doe walked by, Officers Lollar and Baez — and even Lieutenant Dercole — would stare at her buttocks and snicker. Officers Lollar and Baez also regularly commented on her body, saying things like: "Oh, look at your breasts. Are they growing? They're so voluptuous. Are you gaining weight?," or "Look at that ass. Look at them jeans."

39.    As time went on, Officers Lollar and Baez outright propositioned Officer Doe for sex while they were on duty. Officer Baez's refrain was: "When are you gonna give me some of that?" And whenever he said it, he would leer at Officer Doe's crotch and then raise his gaze

slowly to her breasts. Officer Lollar, meanwhile, would wiggle his tongue at Officer Doe as if to simulate cunnilingus.

40.     Officer Doe swallowed her disgust and feelings of degradation, kept her head down, and did her job without complaint. She knew that, not only was Officer Lollar well-liked among his fellow officers, but he was close friends with Officer Baez (whom CCSU later promoted to Sergeant), Lieutenant Dercole, and then–Police Chief Jason Powell. None of these members of leadership ever said or did anything to suggest they would be receptive to complaints about their buddy. Accordingly, not only would complaints to leadership have been futile; they would have made the toxic work environment even worse. ███████████████████████, Officer Doe could not afford to "rock the boat."

### E.     Another Female Officer Joins the Force; the Male Officers Subject Her to Demeaning and Misogynistic Comments.

41.     In 2014, another female officer, Officer Janet Roe, joined the Department, ██████ ████████████████. In her interview with the ODE, when asked how women are treated in the department, she responded: "You're always one step below them; below the boys['] club," adding that she had been "down-graded and dismissed" because of her gender. Officer Roe, however, was far more assertive than Officer Doe. So while Officer Lollar did make sexualized and misogynistic comments to Officer Roe, he did not target her to the same degree as he did Officer Doe.

42.     In the fall of 2017, after Officer Lollar told Officer Roe that she was being "too sensitive" and that it must be because it was her "time of the month," Officer Roe reported the harassment to Lieutenant Dercole and expressly informed him that Officer Lollar had been harassing her in front of Sergeant Baez, who had done nothing in response. She stated that Sergeant Baez's silence "was empowering Lollar's behavior." She also "expressed concerns of

possible retaliatory and passive aggressive behaviors from colleagues due to a complaint being made." To date, Officer Roe has not received any response to her complaint.

**F.    CCSU Officers Engage in Sexual Activity with CCSU's Female Students.**

43.    The CCSU officers did not limit their sexual harassment to words alone. Rather, on multiple instances, these officers enacted the very sexual conduct that their words had so clearly foreshadowed. In 2014, for example, the same Officer Magarolas who repeatedly catcalled CCSU's female students was discovered in a dark, locked room in the Student Technology Center with a teenaged student worker. After they were found, Officer Magarolas gave the student worker a ride in his squad car and failed to report the transport. Remarkably, although Officer Magarolas had been cited for similar transgressions in the past, CCSU punished him with just a single-day suspension.

44.    Another frequent catcaller, Officer Baez, appeared to many to be having an affair with a female student. He drove her around in his police cruiser, brought her to the Department for lunch, and met with her privately in her dormitory while he was still on duty, asking others to cover for him. Although this relationship violated the CCSU policy, neither the Department nor the University ever reprimanded Officer Baez. Quite the opposite: CCSU promoted Officer Baez first to Acting Sergeant and then to full Sergeant in 2017.

**G.    Officers Lollar and Baez Fondle Officer Doe's Breasts and Buttocks.**

45.    Officer Doe was also a target of unwanted sexual contact. Officer Lollar often "accidentally" stroked her buttocks with his hand and rubbed against her backside with his crotch. And both he and Officer Baez fondled her breasts whenever they were physically close enough to intrude on her personal space. Indeed, they frequently manipulated where and how they walked so that they could be near enough to graze her breasts. Officer Doe recalls multiple instances when

Officer Lollar stood behind her while she took a drink of water from the water fountain and then touched her breasts with his chest or shoulder when she stood up to leave.  Officer Doe repeatedly asked both men to stop, but they were undeterred.  In response to her exhortations, Officer Lollar laughed crudely and ignored her.

### H.   Officer Lollar Rapes Officer Doe Twice During the Summer of 2014.

46.   In or about the summer of 2014, Officer Lollar raped Officer Doe twice.  Both times, she was on duty, alone, at night, and patrolling a campus building that was sparsely populated.  Both times, Officer Lollar silently stalked her, used his passkey to enter the vacant room she was patrolling, and then cornered her there.  Both times, as she tried to fight him off, he crudely laughed and then used brute force — he is 6'2 and 260 pounds, she is 5'4 and 125 pounds — to effectuate the rapes.  And both times, for the reasons set forth above, she told no one.

47.   After the rapes, Officer Doe requested to be placed on a different weekend shift so she would not have to work alone with Officer Lollar.  She explained to Lieutenant Dercole that she did not feel safe with Officer Lollar.  Lieutenant Dercole granted the request for the shift change but asked no follow-up questions.

### I.   Officer Lollar Rapes Officer Doe for a Third Time.

48.   In the late fall of 2016, Officer Lollar raped Officer Doe for the third time.  Before the rape, Officer Lollar announced that he would be hosting a "card party" at his house, and he and his fellow officers urged Officer Doe to attend.  Thereafter, Officer Lollar repeatedly pressured Officer Doe to visit his house in advance of the party, purportedly so she would be familiar with the location of his house on the day of the event.  Each time, she rejected him, fearing he would attack her again.  But he kept insisting, promising he would not touch her.  Eventually, she relented and agreed to go.  She went in large part because she feared his vengeance if she continually

rejected his invitations.  But she also went because she wanted so badly to believe that she could bury the past, not fear him any longer, and be viewed by him and other co-workers as just another colleague.

49.     Shortly after Officer Doe entered the house, Officer Lollar grabbed her and ripped off the long underwear and pants she was wearing.  As she fought to get free, she repeatedly cried out: "You promised me."  Officer Lollar laughed that same crude laugh, and he raped her again.

**J.     Officer Doe Reports the Third Rape to Lieutenant Dercole, who Notifies Chief Sneed; Neither Leader Takes Any Action.**

50.     In late November 2016, Officer Doe reported to Lieutenant Dercole that she had been sexually assaulted by a co-worker.  Fearful that she would be subjected to retaliation, she asked Lieutenant Dercole to keep the matter confidential.  While Lieutenant Dercole asked for her to identify the co-worker who raped her, he never assured her she would be safe if she did.  After she declined to name him, Lieutenant Dercole did not refer her to a Title IX Coordinator or any other resource.  The only action he took was to notify Police Chief Gregory Sneed and to tell Officer Doe he had done so.

51.     Chief Sneed's response was even more feeble than his lieutenant's.  He did and said nothing.  At some point in 2017, Chief Sneed asked Officer Doe if there was something she needed to tell him.  Still fearing retaliation, Officer Doe replied in the negative.  Chief Sneed's only response was to say: "Ok, young lady."  Officer Sneed later informed the ODE that the last time he observed Officer Doe distraught, he did not ask her about the sexual assaults.  Instead, he sent her a Bible verse.

### K.    Officer Lollar Twice Sexually Assaults Another Female Co-Worker; She, Like Officer Doe, Is Too Afraid to Report Him.  Officer Lollar Then Sexually Harasses a Student Worker; Despite Her Report to Lieutenant Cervoni, He Does Nothing.

52.    Officer Doe was not Officer Lollar's only victim of sexual violence in the Department.  A Female Department Employee reported to the ODE that Officer Lollar made repeated sexualized comments to her about her breasts.  He also boasted to her: "I had a Jamaican give me a blow job, and she was able to take all of it."

53.    These comments ultimately culminated in two outright sexual assaults, both of which occurred while the Female Department Employee was working.  On the first occasion, Officer Lollar put his hand down her shirt and fondled her breast.  On the second occasion, he pulled his pants down, took her hand, and put it on his exposed penis.  When the ODE asked the Female Department Employee why she did not report Officer Lollar's conduct sooner, she explained:

> Officer Lollar is intimidating, carries multiple weapons, and is vindictive.  I know I should have done something[,] but I still had to work.  Once you're on his bad side[,] you're on his bad side.

54.    The Female Department Employee also shared with the ODE that a female student worker told her that Officer Lollar was following her around and staring at her buttocks.  The Female Department Employee reported the student worker's concerns about Officer Lollar with Lieutenant Christopher Cervoni, who "brushed it off."  At one point, the student worker directly reported Officer Lollar's sexual harassment of her to Lieutenant Cervoni himself.  The lieutenant's only response was: "He [Officer Lollar] is checking on you."  ODE did not seek to clarify what Lieutenant Cervoni meant by that remark.

55.    The Female Department Employee made it clear during her interview with the ODE that, while Officer Lollar may have been the worst offender, he was not the only one responsible

for the hostile work environment in the Department.  She described being stared at in a sexual manner by several other officers, including Sergeant Baez.  She alluded to other sexualized conduct in the workplace, stating: "There're a lot of things we brush off, being the department, you ignored it."  She added that any complaints would be futile in any event: "All of them are second shift buddies . . . .  Issues are covered up because they are buddies."

### L.   After Reporting the Sexual Assaults to Lieutenant Dercole, Officer Doe Suffers the Retaliation She Feared.

56.     Although senior officers on the Force had previously subjected Officer Doe to bullying tactics, after her report the harassment intensified in frequency and nature.  The two most frequent tactics they employed to harass her were referred to as "bogarting" and "gaslighting."

57.     They "bogarted" Officer Doe by usurping her authority and making decisions for her when she was the first on the scene of an incident in her primary jurisdiction.  "Bogarting" not only undermined Officer Doe's authority; it prevented her from developing and demonstrating her leadership capabilities and from gaining the experience she needed to be considered for promotions.

58.     Sergeant Baez and another sergeant, Orlando Oliveira, "gaslighted" Officer Doe by criticizing her written reports, demanding specific changes, and then, when she satisfied those specifications, acting as if they had never asked for the changes in the first place and criticizing her for making them.  Officer Doe's partner on the Force was so disturbed by this conduct that he started to help Officer Doe complete her incident reports.  Tellingly, although the reports Officer Doe's partner prepared and signed had never before been criticized, the ones he helped Officer Doe write — and to which she signed her name — always seemed to meet the same derision from the sergeants.

59.     On one occasion, Officer Doe summoned up the courage to speak to Lieutenant Cervoni about Sergeant Oliveira's gaslighting of her.   During her meeting with Lieutenant Cervoni, she handed him a piece of paper that defined "gaslighting" as a tactic in which a person "makes a victim question their reality" and does so in order to "gain more power."   Lieutenant Cervoni "investigated" the matter by speaking with Sergeant Oliveira, who denied the accusation. He then told Officer Doe that Sergeant Oliveira had done nothing wrong but that he would "keep an eye out concerning her claims of Gaslighting."   That was Officer Doe's first and last complaint about gaslighting.

60.     Much more seriously, several male officers, including Officer Lollar, affirmatively endangered Officer Doe in the field.   When Officer Doe was alone and called for back-up, for example, this group of male officers either significantly delayed their responses or even failed to respond at all.   On at least two occasions, Officer Doe called for back-up at traffic stops when she was alone, but no back-up arrived.

61.     Sergeant Baez further retaliated against Officer Doe by taking away from her the one officer with whom she felt safe: her longtime partner.   When she asked for an explanation, citing the fact that no other paired officers had ever been separated, Sergeant Baez merely said, in substance: "Because I said so."   Once Sergeant Baez removed Officer Doe's partner, there was not a single officer on the Force to whom Officer Doe could turn for protection.

**M.     Officer Doe Reports the Rapes to the Director of the Women's Center in CCSU's Office of Diversity & Equity.**

62.     Throughout the fall of 2017, Officer Lollar's sexual harassment of Officer Doe intensified in nature and frequency.   It was not uncommon for him to leer at her, point at her crotch, and say: "I still want some of that."   Sergeant Baez's restriction on Officer Doe's partner riding

with her left her fully exposed on the job. And she feared that it was only a matter of time before Officer Lollar would rape her again.

63.     In mid-November 2017, Officer Doe summoned up the courage to confide in Jacqueline Cobbina-Boivin, the Director of the Women's Center in CCSU's ODE. She described the sexual harassment to which her male colleagues were subjecting her, ████████████████ ████, and the female students who they were tasked with protecting. And she told Ms. Cobbina-Boivin that Officer Lollar had raped her on multiple occasions.

64.     Thereafter, CCSU suspended Officer Lollar with full pay. He remained on paid leave for nearly a full year before CCSU terminated him.

65.     Since July 2018, in contrast, Officer Doe has been on leave from the Department without pay.

**N.     The Office of Diversity and Equity Challenges Officer Doe's Credibility, Interrogates Her About Irrelevant Details, and Forces Her to Relive the Rapes.**

66.     In response to Officer Doe's report, the ODE conducted an investigation of the rapes, including two interviews of Officer Doe.

67.     The interviews of Officer Doe, which were led by Sharon Gaddy and attended by Ellen Mantel of CCSU Human Resources, were nearly identical in content, forcing Officer Doe to gratuitously revisit the past trauma.

68.     By the time the ODE conducted its first interview of Officer Doe, Ms. Cobbina-Boivin, the Director of the Women's Center, had reported to the ODE the substance of her conversation with Officer Doe. She provided a written summary of Officer Doe's description of all three rapes, referencing Officer Doe as Individual A and Officer Lollar as Individual B:

Individual B was very aggressive, did not stop when Individual A demanded he stop. Individual A made it very clear that consent was not given (stated no and used force to push him away) at any time.

69.     By the second interview, the same interviewers had already spoken to the Female Department Employee who described in graphic detail Officer Lollar's two sexual assaults of her and her fear of reporting him because of his "vindictive" nature.

70.     Two weeks before the second interview, Chief Sneed informed Rosa Rodriguez, Chief Diversity Officer of the ODE, that he had just spoken with Officer Doe and that "she has fear from the police perspective." He stated that he was so concerned about her emotional state that "he wanted to check in with her as an officer with a weapon to see if she was ok."

71.     Upon information and belief, Chief Sneed meant that he was so concerned about Officer Doe's mental state that he thought she might harm herself.

72.     Despite Chief Sneed's admonition, neither ODE interviewer offered Officer Doe any resources to cope with her trauma. Instead, they unnecessarily re-traumatized her.

73.     The support person who accompanied Officer Doe to her second interview —– a lead union steward for 14 years and participant in hundreds of investigations -– described the interview as a "horrific" "interrogation." Ms. Gaddy questioned Officer Doe's memory and truthfulness and challenged her failure to report the incident over the radio system. The interviewers asked Officer Doe unduly invasive questions, often repeating questions for each of the rapes. The questions included:

a.      How did your underwear get off?

b.      At any point, did you give consent?

c.      When Officer Lollar entered the room, what direction were you facing?

d.      Why didn't you use your radio?

e.      Demonstrate how your belt was unfastened.

    f.       Demonstrate where you were in the room in relation to Officer Lollar.

    g.       Demonstrate the sexual assault (which the interviewers called "the incident").

    h.       Did he kiss you?

    i.       Did you have a pregnancy test done?  (The interviewers asked this question repeatedly, ███████████████████████████████ ███████████.)

    j.       Describe how he violated you.

    k.       At any point during these instances, did he penetrate you with his fingers, penis, or any other objects?

74.    Officer Doe sobbed on at least three occasions during that interview (each time after they interrogated her about each rape), but the ODE investigators persisted in asking her invasive questions and never offered her a break or expressed any compassion for her pain.

75.    Officer Doe's support person recalls other disturbing aspects of the interview apart from the invasive questions.  Most notable were Ms. Gaddy's repeated and pointed references to Officer Lollar's "alleged" penetration of Officer Doe.

76.    Ms. Gaddy also asked questions that redirected Officer Doe back to her trauma even after they had moved on to a different topic.  Time and again she asked Officer Doe about her belt and how it became unfastened.  After multiple questions along these lines, Officer Doe finally replied: "I don't understand why this plays such a significant part.  My belt was on, main thing is what he did."

77.    At one point, when she was asked to describe the third rape yet again, Officer Doe replied:

> Officer Lollar grabbed me, pushed me down on the couch, pulled down my pants,
> a scuffle took place. I don't want to go over this again. What are the unanswered
> questions? Maybe I can answer the specific unanswered questions.

The next question posed by the investigator was one that had already been asked and answered in

that same interview.

### O.   The CCSU Police Department Continues to Retaliate Against Officer Doe After Her Report to the Office of Diversity and Equity.

78.    After Officer Doe's report to the ODE, the Department intensified still further its

targeting of her, with Officer Lollar's close friend, Sergeant Baez, taking the lead. Prior to her

report to the ODE, although Officer Doe's supervisors gaslighted and bogarted her, they never

officially reprimanded her. But following her report, Sergeant Baez frequently wrote Officer Doe

up for small issues. He also sought to shame her in front of her colleagues. For example, he

highlighted incorrect information in a ticket she issued, and he left it on a table where everyone in

the Department could see. For another example, in April or May of 2018, Sergeant Baez, Sergeant

Oliveira, and Lieutenant Cervoni showed the Police Department members a video of Officer Doe's

response to a student's 2016 suicide attempt, shaming her for her work on the incident.

79.    Sergeant Baez also subjected Officer Doe to verbal abuse and even threatened her

physical safety. On one occasion, Officer Doe and her partner responded to an incident involving

a student under the influence of drugs. Upon their return, in the presence of Officer Doe's partner,

Sergeant Baez loudly berated Officer Doe for the content of her report. He concluded his tirade

with this threat: "You're out there on your motherfucking own!"

80.    Immediately after Sergeant Baez threatened her, Officer Doe e-mailed Lieutenant

Cervoni and asked to speak with him about Sergeant Baez. Lieutenant Cervoni called her into his

office. When she arrived, she was shocked to see that Sergeant Baez was already there, laughing

with Lieutenant Cervoni. Officer Doe asked whether they had already discussed the incident she

planned to raise; Lieutenant Cervoni admitted they had. Lieutenant Cervoni then required Officer Doe to discuss the issue in Sergeant Baez's presence. Sergeant Baez responded in sum and substance with another threat: "I could put a whole bunch of stuff in your record that you don't know."

**P.      Sergeant Baez's Retaliation and Continuation of the Hostile Work Environment Pushes Officer Doe Over the Edge, Forcing Her to Take FMLA Leave.**

81.      While many on the Force engaged in retaliatory acts against Officer Doe following her report to Lieutenant Dercole and later to the ODE, Sergeant Baez took that retaliation to a whole new level. His actions against her could only be described as a full-blown campaign to break her down. He openly watched video footage of her police work in his office and criticized her about small tasks she completed — tasks that he would not know about but for his video-assisted scrutiny of her work. He frequently left his office to observe her while she was on duty abruptly showed up on her beat, and often arrived at her traffic stops unexpectedly and unannounced. Because Sergeant Baez had deprived Officer Doe of her ability to ride with her partner, she often was alone when Sergeant Baez arrived and felt afraid to be in isolated locations with him.

82.      As time passed and the hostile and retaliatory environment continued, Officer Doe's health deteriorated. She developed significant weight loss and shaky hands; she had trouble sleeping; and she began having migraines so severe that she could not go to work.

83.      In July 2018, Sergeant Baez summoned Officer Doe into his office and loudly demanded: "What do you have to say to me? I know you have something to say. Come on, this is your chance, say what you want to say." Officer Doe, unnerved, repeatedly told him she had nothing to say to him. Later that same night, Officer Doe observed Sergeant Baez watching her

from his car as she was walking through the campus surveilling buildings.  But when she looked toward Sergeant Baez's car, he sped away.

84.     This event was the proverbial "straw that broke" Officer Doe's "back."  Shortly thereafter, on July 11, 2018, Officer Doe took FMLA leave.  She has been on FMLA leave ever since.

85.     From the date Jane Doe began working as a police officer with CCSU until the date she went out on FMLA leave, she witnessed Sergeant Baez sexually harass CCSU's female students.  Upon information and belief, CCSU never took any action to stop the harassment or the retaliation.

**Q.     Shipman & Goodwin Conducts a Thorough, Independent Investigation of the CCSU Police Department's Hostile Work Environment, Concluding that Sexual Misconduct and Assault Was Inevitable.**

86.     In 2018, Shipman & Goodwin LLP was tasked with conducting an independent investigation to determine the climate at the CCSU Police Department and the CCSU administration's handling of Officer Doe's reports of sexual assault.

87.     Officer Doe was asked to speak with Shipman & Goodwin in connection with its investigation.  However, she was so fearful about subjecting herself to yet another traumatizing interrogation that she declined to speak with the law firm.

88.     Even without the benefit of Officer Doe's first-hand account, though, Shipman & Goodwin issued a memorandum that makes clear that the multiple instances of sexual assault against Officer Doe were the inevitable product of the Department's hostile culture.  These findings include the following:

a.     The Department decided to hire and retain officers, including Officer Doe's rapist, who had "red flags" in their backgrounds.  Prior to being hired by

CCSU, the officer who raped Officer Doe had been arrested on criminal charges and received a 56-day suspension.

b.    The Department chose to foster a "fraternity-like environment" where inappropriate behavior was the norm; Officer Doe's rapist was a "key participant" in such conduct.

c.    The Department failed to "take seriously sexual harassment prevention and other trainings regarding diversity and equity topics."

d.    The Department failed to adequately supervise its police officers, which resulted in the officer who raped Officer Doe serving as her "officer in charge" for certain shifts.

e.    The Department failed to take disciplinary action against Officer Doe's rapist after it was put on notice that he made sexually charged comments to ████████ female officer on the Force.

89.    The findings in the Shipman & Goodwin Memorandum also make clear why anyone, including Officer Doe, would be reluctant to report a sexual assault by a co-worker. Those findings include:

a.    The work environment "discouraged the reporting of concerns and complaints historically."

b.    "[T]here is confusion as to where members of the Department should go to report various concerns outside the chain of command."

c.    "[T]he Office of Diversity and Equity and its Chief Diversity Officer were commonly characterized as 'not welcoming' . . . ."

d.   "A review of the tape-recorded interviews in this matter [which, upon information and belief, included the interview of Officer Doe] and subsequent interviews with some of the same individuals confirmed the view that reporting concerns to and being interviewed by the Office of Diversity and Equity was not a positive experience."

e.   "Many of the participants . . . commented that . . . they felt as though they were placed on the defensive by accusations made or implied in the interview and that they were generally not supported or given the benefit of the doubt . . . further contribut[ing] to the view that the Office of Diversity and Equity is not viewed as an unbiased forum for investigations into employee concerns."

f.   "[T]here is little formal discipline, even when informal counseling or other measures have been exhausted and further instances of the performance concern or misconduct occur."

90.   The Shipman & Goodwin Memorandum noted that the complaint Officer Doe lodged in 2017, which resulted in the ODE investigation, "reveals serious shortcomings of the Police Department in the handling of the report of the alleged sexual assault one year before the complaint was filed with ODE."  The Memorandum found that, although Lieutenant Dercole and Chief Administrative Officer Richard Bachoo, with whom Lieutenant Dercole shared Officer Doe's allegations, denied they knew that she had been sexually assaulted by another member of the Police Department, Lieutenant Dercole's own contemporaneous notes reflect that Officer Doe did in fact share that information with him.  Nonetheless, no action was taken to investigate Officer Doe's claims or to protect her from the rapist CCSU continued to employ.  Further, even though

the Chief Administrative Officer was on notice that a member of his Department had raped another member, he failed to report the matter to the ODE in contravention of CCSU policies.

91.     Chief Sneed's own actions after he was informed that a member of his Department had been raped by another member were even more egregious.  He failed even to speak with Officer Doe about her claims, let alone to take any measures to investigate them and protect her. Instead, in consultation with CCSU's Chief Administrative Officer, Chief Sneed declined to conduct any internal investigation, relying instead on Officer Doe's expressed desire to Lieutenant Dercole to keep the crimes committed against her by her fellow police officer confidential.  An entire year passed before Chief Sneed even reached out to Officer Doe to inquire about her well-being.  During that year, Chief Sneed allowed her rapist to remain working with her, at times on the same shift.

92.     The Shipman & Goodwin Memorandum made this critical observation about the conduct of the CCSU Police Department following Officer Doe's reports in 2016 and again in 2017 that she had been repeatedly raped by one of its own:

> It is inexplicable that a law enforcement agency like the CCSU Police Department would not have conducted at least some investigation into such a serious allegation against one of its officers as soon as it became aware of the allegation in 2016.  Its failure to do so in this case likely hindered the later 2017 investigation into the matter as memories fade and available evidence may have expired with the passage of time.  Furthermore, in the interim, the Police Department failed to take any other mitigating measures.  The wholly inadequate manner in which this matter was handled calls into serious question the judgment of those responsible for the operation and direct oversight of the Police Department.

**R.** **CCSU's University Counsel Advises CCSU's President that the University Violated Title IX by Failing to Refer Officer Doe's Complaint to its Title IX Coordinator for Investigation; CCSU's Assistant to the President for Safety Does Not Know the Identity of CCSU's Title IX Coordinator.**

93.     In August 2018, CCSU President Zulma Toro forwarded an e-mail to CCSU's

senior management that she had received from Carolyn Magnan, CCSU's University Counsel. In

her e-mail, Ms. Magnan explained to President Toro the University's obligations under Title IX:

> Title IX prohibits discrimination on the basis of sex (including sexual misconduct) under any education program or activity receiving federal financial assistance. This means that such discrimination is prohibited within the operations of a university such as CCSU. Title IX applies not only to students but also to faculty and staff.

94.     Ms. Magnan explained CCSU's obligations under Title IX once it is on notice that

sexual misconduct has occurred:

> [I]f a university knows or reasonably should know of an incident of sexual misconduct, it must take steps to understand what occurred and to respond appropriately. This includes referring the matter to the Title IX Coordinator so that he/she can investigate the allegations . . . . Title IX Coordinators must also offer interim measures to either or both the responding and reporting parties (individualized services such as counseling, . . . restrictions on contact between the parties, changes in work . . . locations, leaves of absences, increased security . . . ). Universities have a legal obligation to adjudicate Title IX complaints by applying their procedures[.] At CCSU, this would be the Student Code of Conduct for students and for faculty and staff the applicable collective bargaining agreements or management and confidential policies.

95.     Bernard Sullivan, CCSU's Assistant to the President for Safety and one of the

recipients of this forwarded e-mail, followed up with this inquiry:

> How would this be applied if the victim talks to someone "as a friend" but refuses to make a complaint. The victim says she was assaulted by a co[-]worker but would not name the individual, won't give any info as to where when how why etc. Should a report still have been made to the [T]itle IX coordinator and who is our Title IX coordinator?

96.     Ms. Magnan responded:

> Yes, a report should have been made and the matter investigated so that we could make a good faith effort to identify the alleged assailant. We should have offered

our Victim Advocate's services to the alleged victim as well as other interim measures.

Ms. Magnan then provided Mr. Sullivan with the name of CCSU's Title IX Coordinator:  Rosa Rodriguez.

**S.**     **CCSU's Assistant to the President for Safety Issues a Report Condemning Police Department Leadership and Its Failure to Investigate Officer Doe's Report.**

97.     In October 2018, Mr. Sullivan wrote a report to "identify and correct" the CCSU Police Department's "defective procedures, policies, and training" and to determine the necessary means "to restore professionalism to the department."

98.     Mr. Sullivan first addressed CCSU's inadequate response to Officer Doe's sexual assault report to Lieutenant Dercole in November 2016.  After Officer Doe reported that her coworker had raped her, Lieutenant Dercole notified Chief Sneed in early December 2016. According to Mr. Sullivan's investigation, Chief Sneed then held a meeting with Chief Administrative Officer Bachoo and Chief Human Resources Officer Anna Suski-Lenczewski to discuss Officer Doe's report and the required next steps.  These three department leaders claimed that they elected not to initiate criminal proceedings or an internal investigation because, "absent any pertinent information and [given] the victim's unwillingness to make a complaint, there was not much they could do."

99.     Mr. Sullivan pointed out a key inconsistency in this reasoning: Chief Sneed, Dr. Bachoo, and Ms. Suski-Lenczewski <u>did</u> have additional pertinent information, because Lieutenant Dercole had submitted a memorandum to Chief Sneed that "clearly stated that the incident involved another member of the police department."  Mr. Sullivan then concluded that Chief Sneed, Dr. Bachoo, and Ms. Suski-Lenczewski violated Title IX by failing to investigate Officer Doe's very serious allegations:

Their decision not to pursue an internal investigation was contrary to the mandatory reporting principles of Title IX and a violation of the University's own policy. Under Title IX, when University administrators become aware of sexual misconduct violations, they are required to take steps to understand what occurred and to respond appropriately. This includes referring the matter to the Title IX Coordinator so that the allegations can be investigated in a prompt, equitable and impartial manner.

100.   This failure to investigate, the report noted, made it "impossible" to gather information needed to substantiate Officer Doe's claims against Officer Lollar.

101.   Indeed, Mr. Sullivan acknowledged in a separate report that the failure to report Officer Doe's complaint of sexual assault to CCSU's Title IX Coordinator was a Title IX violation.

102.   Mr. Sullivan concluded that CCSU should not allow Officer Lollar to return to the CCSU Police Department, as "his return would likely be extremely disruptive and would present significant concerns to the potential for retaliation and a hostile work environment."

103.   In addition to evaluating CCSU's inadequate response to Officer Doe's sexual assault report, Mr. Sullivan issued a series of findings with respect to the Police Department's systemic failures for the previous decade. The applicable findings include:

    a.   When officers (repeatedly) violate rules, the Police Department gives counseling, rather than a progressive discipline, and an expectation that officers will never receive any corrective discipline "creates a lower level of expectation as to the importance of following rules and regulations."

    b.   The antiquated system of appointing an "officer in charge" puts peers into positions of supervising peers, even when the "officer in charge" fails to possess the necessary skills or demonstrate the requisite behavior to supervise others.

27

c.   Between 2009 and 2013, three Department officers should not have been hired based on their history, and two Department officers' questionable hiring should have been monitored on a probationary basis.

d.   "The background [investigation] process itself was flawed because there was no allowance for investigators to document recommendations and the hiring was solely controlled by the police chief."

e.   "Failing to report an alleged sexual assault to the Title IX coordinator at an institution of higher education is a violation of mandatory reporting principles."

f.   Chief Sneed improperly relied on Dr. Bachoo — who also failed to report — to notify the Title IX coordinator of Office Doe's sexual assault complaint.

g.   In 2008, the CCSU Police Department lost its accreditation from the Commission on Accreditation for Law Enforcement Agencies, and the assessment team reported that "[i]t was apparent that the agency was not committed to the accreditation process."

h.   In 2012 and 2013, under Chief Powell, CCSU was fined more than $100,000 for various violations of the Clery Act, a federal statute requiring colleges and universities participating in federal financial aid programs to maintain and disclose campus crime statistics and security information.

i.   In 2016, under Chief Sneed, the CCSU Police Department yet again violated the Clery Act, notwithstanding the hefty penalty imposed on the Department just three years earlier.

      j.      Chief Powell and Dr. Bachoo "seem to have lost appropriate oversight of the department that . . . led to the department coasting along at a low level of achievement."

104.    In response to CCSU's myriad legal and policy violations and systemic failures, Mr. Sullivan offered a series of recommendations, including department-wide sensitivity training and, for "several police officers," a presentation called "Intervention Strategies for Law Enforcement Officers working with Victims of Sexual Violence."

105.    Notably Mr. Sullivan — who, prior to his report, did not even know who the University's Title IX Coordinator was — made no recommendation about disciplining, let alone terminating, any member of the Department's leadership, including Chief Sneed or Lieutenant Dercole.

**T.**    **CCSU's Culture of Rampant Sexism Continues Unabated.**

106.    As stated in the introductory paragraph, this case is about abject institutional failure from top to bottom. The seeds for this failure were planted as early as 2008, when the CCSU Police Department lost its accreditation by CALEA, and since then has only continued to grow, notwithstanding the numerous fines and sanctions imposed on the University.

107.    Indeed, despite repeated opportunities over the years to learn from its mistakes, CCSU appears determined to ignore the maxim: "Those who cannot remember the past are condemned to repeat it." As recently as January 2019, yet another cover-up of sexual misconduct at CCSU surfaced. This time, Shipman & Goodwin investigated the issue and documented two longtime theater professors' inappropriate sexual activities with students. CCSU has placed both professors on administrative leave and continues to pay them their annual salaries of over $100,000. As stated above, Officer Doe in contrast remains on leave without pay.

108.   The Shipman & Goodwin report on this latest debacle at CCSU reflects similar, pervasive institutional failures as those present in Officer Doe's case.  For example, some high-level administrators were aware of concerns about the theater department's culture for more than a decade but left the department to its own devices.

109.   Although Dr. Toro has publicly announced her intention to make systemic changes in response to the various sexual misconduct investigations over the last two years, nothing about CCSU's response to Officer Doe's report suggests this to be true.  Shortly after the announcement of Shipman & Goodwin's investigation into the theater department, Dr. Toro held a meeting with the CCSU Police Department, including the police chief, lieutenants, and sergeants.  During the meeting, Dr. Toro announced her full support of the Police Department leadership.

110.   Officer Lollar may be gone, then, but business as usual continues at the CCSU Police Department.  It is only a matter of time before the next Officer Lollar is set loose on CCSU's female students and employees.

## VI.   LEGAL CLAIMS

### COUNT ONE:
### HOSTILE WORK ENVIRONMENT, IN VIOLATION OF TITLE IX
### OF THE EDUCATION AMENDMENTS OF 1972, 20 U.S.C. § 1681,
### AGAINST CENTRAL CONNECTICUT STATE UNIVERSITY.

111.   The plaintiff incorporates by reference all preceding allegations in this Complaint.

112.   The plaintiff sustained harassment because of her sex that was sufficiently severe or pervasive to alter the terms or conditions of her employment and create a hostile working environment.

113.   All acts that constituted and contributed to the hostile working environment were part of the same unlawful practice, and one or more acts contributing to the hostile working environment occurred within the statutory limitations period.

114.    CCSU had actual knowledge of the harassment sustained by the plaintiff and other female employees and students of CCSU.

115.    The harassment occurred in a context that was subject to CCSU's control and where CCSU could have taken remedial action.

116.    As a result of CCSU's discrimination, the plaintiff suffered damages.

**COUNT TWO:**
**DELIBERATE INDIFFERENCE, IN VIOLATION OF TITLE IX**
**OF THE EDUCATION AMENDMENTS OF 1972, 20 U.S.C. § 1681,**
**AGAINST CENTRAL CONNECTICUT STATE UNIVERSITY.**

117.    The plaintiff incorporates by reference all preceding allegations in this Complaint.

118.    The plaintiff sustained harassment because of her sex that was sufficiently severe or pervasive to alter the terms or conditions of her employment and create a hostile working environment.

119.    All acts that constituted and contributed to the hostile working environment were part of the same unlawful practice, and one or more acts contributing to the hostile working environment occurred within the statutory limitations period.

120.    CCSU acted with deliberate indifference insofar as one or more officials at CCSU with authority to address the sex discrimination against the plaintiff and to institute corrective measures had actual knowledge of the discrimination and failed to respond and/or responded in a clearly unreasonable fashion in light of the known circumstances.  Specifically, the official or officials did not take actions that were reasonably calculated to end the discrimination.

**COUNT THREE:**
**RETALIATION, IN VIOLATION OF TITLE IX**
**OF THE EDUCATION AMENDMENTS OF 1972, 20 U.S.C. § 1681,**
**AGAINST CENTRAL CONNECTICUT STATE UNIVERSITY.**

121.    The plaintiff incorporates by reference all preceding allegations in this Complaint.

122.    The plaintiff engaged in protected activity within the meaning of Title IX.

123.    CCSU retaliated against the plaintiff because of her protected activity.

124.    The retaliation by CCSU continued and amplified the hostile work environment to which CCSU had been subjecting the plaintiff on the basis of her sex, insofar as it constituted part of a pattern of ongoing hostility and animus toward the plaintiff on that basis.

125.    The retaliation by CCSU might well have dissuaded a reasonable person in the plaintiff's position from making a charge of discrimination.

126.    As a result of CCSU's retaliation, the plaintiff suffered damages.

**COUNT FOUR:**
**ASSAULT, AGAINST CURTIS LOLLAR, IN HIS INDIVIDUAL CAPACITY.**

127.    The plaintiff incorporates by reference all preceding allegations in this Complaint.

128.    Officer Lollar intentionally caused the plaintiff to imminently apprehend that she would be subjected to harmful or offensive contact.

129.    Officer Lollar's conduct in this regard was wanton, reckless, and/or malicious.

130.    As a result of Officer Lollar's conduct, the plaintiff suffered damages.

**COUNT FIVE:**
**BATTERY, AGAINST CURTIS LOLLAR, IN HIS INDIVIDUAL CAPACITY.**

131.    The plaintiff incorporates by reference all preceding allegations in this Complaint.

132.    Officer Lollar made harmful or offensive contact with the plaintiff, to which the plaintiff did not consent.

133.    Officer Lollar's conduct in this regard was wanton, reckless, and/or malicious.

134.    As a result of said contact, the plaintiff suffered damages.

**COUNT SIX:**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS,**
**AGAINST CURTIS LOLLAR, IN HIS INDIVIDUAL CAPACITY.**

135.    The plaintiff incorporates by reference all preceding allegations in this Complaint.

136.    Officer Lollar engaged in conduct that was extreme or outrageous.

137.    Officer Lollar intended to inflict emotional distress or knew or should have known that emotional distress was the likely result of his conduct.

138.    Officer Lollar's conduct in this regard was wanton, reckless, and/or malicious.

139.    Officer Lollar's conduct caused the plaintiff severe emotional distress.

**COUNT SEVEN:**
**ASSAULT, AGAINST RAMON BAEZ, IN HIS INDIVIDUAL CAPACITY.**

140.    The plaintiff incorporates by reference all preceding allegations in this Complaint.

141.    Sergeant Baez intentionally caused the plaintiff to imminently apprehend that she would be subjected to harmful or offensive contact.

142.    Sergeant Baez's conduct in this regard was wanton, reckless, and/or malicious.

143.    As a result of Sergeant Baez's conduct, the plaintiff suffered damages.

**COUNT EIGHT:**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS,**
**AGAINST RAMON BAEZ, IN HIS INDIVIDUAL CAPACITY.**

144.    The plaintiff incorporates by reference all preceding allegations in this Complaint.

145.    Sergeant Baez engaged in conduct that was extreme or outrageous.

146.    Sergeant Baez intended to inflict emotional distress or knew or should have known that emotional distress was the likely result of his conduct.

147.    Sergeant Baez's conduct in this regard was wanton, reckless, and/or malicious.

148.    Sergeant Baez's conduct caused the plaintiff severe emotional distress.

## COUNT NINE:
### VIOLATION OF THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT TO THE U.S. CONSTITUION, PURSUANT TO 42 U.S.C. § 1983, AGAINST CURTIS LOLLAR, IN HIS INDIVIDUAL CAPACITY.

149.    The plaintiff incorporates by reference all preceding allegations in this Complaint.

150.    Officer Lollar acted under color of law.

151.    Officer Lollar deprived the plaintiff of her clearly-established right, under the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution, to be free from the sexually-discriminatory use of force and sexually-discriminatory harassment.

152.    Officer Lollar acted with the intent or purpose to discriminate against the plaintiff on the basis of her sex.

153.    Officer Lollar's conduct in this regard was wanton, reckless, and/or malicious.

154.    Officer Lollar's conduct in this regard was a knowing and/or recklessly indifferent violation of the plaintiff's constitutional rights.

155.    As a result of said contact, the plaintiff suffered damages.

## COUNT TEN:
### VIOLATION OF THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT TO THE U.S. CONSTITUION, PURSUANT TO 42 U.S.C. § 1983, AGAINST RAMON BAEZ, IN HIS INDIVIDUAL CAPACITY.

156.    The plaintiff incorporates by reference all preceding allegations in this Complaint.

157.    Sergeant Baez acted under color of law.

158.    Sergeant Baez deprived the plaintiff of her clearly-established right, under the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution, to be free from the sexually-discriminatory use of force and sexually-discriminatory harassment.

159.    Sergeant Baez acted with the intent or purpose to discriminate against the plaintiff on the basis of her sex.

160.   Sergeant Baez's conduct in this regard was wanton, reckless, and/or malicious.

161.   Sergeant Baez's conduct in this regard was a knowing and/or recklessly indifferent violation of the plaintiff's constitutional rights.

162.   As a result of said contact, the plaintiff suffered damages.

**COUNT ELEVEN:**
**VIOLATION OF THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH**
**AMENDMENT TO THE U.S. CONSTITUION, PURSUANT TO 42 U.S.C. § 1983,**
**AGAINST GREGORY SNEED, IN HIS INDIVIDUAL CAPACITY.**

163.   The plaintiff incorporates by reference all preceding allegations in this Complaint.

164.   Chief Sneed acted under color of law.

165.   Chief Sneed deprived the plaintiff of her clearly-established right, under the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution, to be free from the sexually-discriminatory use of force and sexually-discriminatory harassment.

166.   Chief Sneed had actual knowledge of the sexually-discriminatory use of force and/or sexually-discriminatory harassment of the plaintiff by one or more members of the Department.

167.   Chief Sneed's response to that knowledge was so clearly unreasonable in light of the known circumstances as to give rise to a reasonable inference that he intended for the sexually-discriminatory use of force and/or sexually-discriminatory harassment to occur.

168.   Chief Sneed's conduct in this regard was wanton, reckless, and/or malicious.

169.   Chief Sneed's conduct in this regard was a knowing and/or recklessly indifferent violation of the plaintiff's constitutional rights.

170.   As a result of said contact, the plaintiff suffered damages.

## COUNT TWELVE:
### VIOLATION OF THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT TO THE U.S. CONSTITUION, PURSUANT TO 42 U.S.C. § 1983, AGAINST EDWARD DERCOLE, IN HIS INDIVIDUAL CAPACITY.

171.    The plaintiff incorporates by reference all preceding allegations in this Complaint.

172.    Lieutenant Dercole acted under color of law.

173.    Lieutenant Dercole deprived the plaintiff of her clearly-established right, under the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution, to be free from the sexually-discriminatory use of force and sexually-discriminatory harassment.

174.    Lieutenant Dercole had actual knowledge of the sexually-discriminatory use of force and/or sexually-discriminatory harassment of the plaintiff by one or more members of the Department.

175.    Lieutenant Dercole's response to that knowledge was so clearly unreasonable in light of the known circumstances as to give rise to a reasonable inference that he intended for the sexually-discriminatory use of force and/or sexually-discriminatory harassment to occur.

176.    Lieutenant Dercole's conduct in this regard was wanton, reckless, and/or malicious.

177.    Lieutenant Dercole's conduct in this regard was a knowing and/or recklessly indifferent violation of the plaintiff's constitutional rights.

178.    As a result of said contact, the plaintiff suffered damages.

## COUNT THIRTEEN:
### VIOLATION OF THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT TO THE U.S. CONSTITUION, PURSUANT TO 42 U.S.C. § 1983, AGAINST CHRISTOPHER CERVONI, IN HIS INDIVIDUAL CAPACITY.

179.    The plaintiff incorporates by reference all preceding allegations in this Complaint.

180.    Lieutenant Cervoni acted under color of law.

36

181.   Lieutenant Cervoni deprived the plaintiff of her clearly-established right, under the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution, to be free from the sexually-discriminatory use of force and sexually-discriminatory harassment.

182.   Lieutenant Cervoni had actual knowledge of the sexually-discriminatory use of force and/or sexually-discriminatory harassment of the plaintiff by one or more members of the Department.

183.   Lieutenant Cervoni's response to that knowledge was so clearly unreasonable in light of the known circumstances as to give rise to a reasonable inference that he intended for the sexually-discriminatory use of force and/or sexually-discriminatory harassment to occur.

184.   Lieutenant Cervoni's conduct in this regard was wanton, reckless, and/or malicious.

185.   Lieutenant Cervoni's conduct in this regard was a knowing and/or recklessly indifferent violation of the plaintiff's constitutional rights.

186.   As a result of said contact, the plaintiff suffered damages.

**COUNT FOURTEEN:**
**VIOLATION OF THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT TO THE U.S. CONSTITUION, PURSUANT TO 42 U.S.C. § 1983, AGAINST RAMON BAEZ, IN HIS INDIVIDUAL CAPACITY.**

187.   The plaintiff incorporates by reference all preceding allegations in this Complaint.

188.   Sergeant Baez acted under color of law.

189.   Sergeant Baez deprived the plaintiff of her clearly-established right, under the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution, to be free from the sexually-discriminatory use of force and sexually-discriminatory harassment.

190.   Sergeant Baez had actual knowledge of the sexually-discriminatory use of force and/or sexually-discriminatory harassment of the plaintiff by one or more members of the Department.

191.    Sergeant Baez's response to that knowledge was so clearly unreasonable in light of the known circumstances as to give rise to a reasonable inference that he intended for the sexually-discriminatory use of force and/or sexually-discriminatory harassment to occur.

192.    Sergeant Baez's conduct in this regard was wanton, reckless, and/or malicious.

193.    Sergeant Baez's conduct in this regard was a knowing and/or recklessly indifferent violation of the plaintiff's constitutional rights.

194.    As a result of said contact, the plaintiff suffered damages.

**COUNT FIFTEEN:**
**INTIMIDATION BASED ON BIGOTRY OR BIAS,**
**IN VIOLATION OF § 52-571C OF THE CONNECTICUT GENERAL STATUTES,**
**AGAINST CURTIS LOLLAR, IN HIS INDIVIDUAL CAPACITY.**

195.    The plaintiff incorporates by reference all preceding allegations in this Complaint.

196.    Officer Lollar engaged in one or more acts that constituted one or more violations of §§ 53a-181j and/or 53a-181k of the Connecticut General Statutes.

197.    Specifically, Officer Lollar maliciously, and with specific intent to intimidate or harass the plaintiff because of the plaintiff's sex, caused physical injury to the plaintiff and/or caused or threatened to cause physical contact with the plaintiff.

198.    Officer Lollar's conduct in this regard was wanton, reckless, and/or malicious.

199.    As a result of said contact, the plaintiff suffered damages.

**COUNT SIXTEEN:**
**INTIMIDATION BASED ON BIGOTRY OR BIAS,**
**IN VIOLATION OF § 52-571C OF THE CONNECTICUT GENERAL STATUTES,**
**AGAINST RAMON BAEZ, IN HIS INDIVIDUAL CAPACITY.**

200.    The plaintiff incorporates by reference all preceding allegations in this Complaint.

201.    Sergeant Baez engaged in one or more acts that constituted one or more violations of §§ 53a-181j and/or 53a-181k of the Connecticut General Statutes.

202.    Specifically, Sergeant Baez maliciously, and with specific intent to intimidate or harass the plaintiff because of the plaintiff's sex, caused physical injury to the plaintiff and/or caused or threatened to cause physical contact with the plaintiff.

203.    Sergeant Baez's conduct in this regard was wanton, reckless, and/or malicious.

204.    As a result of said contact, the plaintiff suffered damages.

* * *

WHEREFORE, the plaintiff respectfully prays that this Court award the following damages, jointly and severally, from each defendant:

a.      Economic damages;

b.      Compensatory damages;

c.      Injunctive relief;

d.      Punitive damages for the defendants' willful and/or recklessly indifferent conduct;

e.      Attorneys' fees and costs; and

f.      Any other remedy that may appear to be just and proper.

> **RESPECTFULLY SUBMITTED,**
> **THE PLAINTIFF**
>
> By:  *Nina T. Pirrotti  (EJL)*
> Nina T. Pirrotti (*ct26792*)
> Joshua R. Goodbaum (*ct28832*)
> Elisabeth J. Lee (*ct30652*)
> GARRISON, LEVIN-EPSTEIN,
>       FITZGERALD & PIRROTTI, P.C.
> 405 Orange Street
> New Haven, Connecticut, 06511
> Tel.:  (203) 777-4425
> Fax:  (203) 776-3965
> npirrotti@garrisonlaw.com
> jgoodbaum@garrisonlaw.com
> elee@garrisonlaw.com
>
> HER COUNSEL

**Please enter our appearances on behalf of the Plaintiff in this matter.**