UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

JANE DOE,
    *Plaintiff*,

v.

CENTRAL CONNECTICUT STATE
UNIVERSITY, et al.,
    *Defendants*.

No. 3:19cv418 (MPS)

## RULING ON MOTION TO DISMISS

Plaintiff Jane Doe,[1] an officer with Central Connecticut State University's ("CCSU") police department, brings this action against CCSU and other members of the department -- Officer Curtis Lollar, Sergeant Ray Baez, Chief of Police Gregory Sneed, and Lieutenants Edward Dercole and Christopher Cervoni. Doe alleges sexual harassment and retaliation in violation of Title VII, 42 U.S.C. § 2000e *et seq.*, Title IX, 20 U.S.C. § 1681 *et seq.*, and the Connecticut Fair Employment Practices Act, Conn. Gen. Stat. § 46a-60(b); violation of the Equal Protection Clause; and state law claims including assault, battery, and intentional infliction of emotional distress. (ECF No. 30.) Pursuant to Fed. R. Civ. P. 12(b)(6), Lieutenant Cervoni moves to dismiss the Equal Protection claim asserted against him (count 13) and CCSU moves to dismiss Doe's Title IX employment discrimination claims (counts 1 - 3) and CFEPA claims (counts 19 – 21). (ECF No. 34.) For the reasons that follow, Cervoni's motion is DENIED and CCSU's motion is GRANTED IN PART and DENIED IN PART.

**I.    FACTS**

The following facts, taken from Doe's amended complaint (ECF No. 30), are treated as true

---

[1] Plaintiff was granted leave to proceed using the pseudonym "Jane Doe." (ECF No. 32).

for the purposes of the motion to dismiss.

In 2010, Doe began working as an officer in CCSU's police department. (ECF No. 30 at ¶ 30.) At the time she was hired, CCSU had no female police officers. (ECF No. 33 at ¶ 31.) CCSU did not hire another female officer until 2014 and then hired only one. (ECF No. 33 at ¶ 41.) The department was a "good old boys network" in which the sexualization and objectification of women was second nature. (ECF No. 30 at ¶ 32.) Officer Lollar and Sergeant Baez routinely sexually harassed CCSU's female students and their supervisor, Lieutenant Dercole, witnessed their conduct but failed to do anything to stop it. (ECF No. 30 at ¶¶ 35 – 36.) Doe was the subject of sexualized comments about her body by Lollar and Baez. (ECF No. 30 at ¶ 38.) The other female officer, Officer Roe, also was the subject of sexualized and misogynistic comments. (ECF No. 30 at ¶ 41.) In 2017, Roe told Lieutenant Dercole that Lollar had sexually harassed her in front of Baez, who had done nothing in response. (ECF No. 30 at ¶ 42.) Roe did not receive any response to her complaint. (ECF No. 30 at ¶ 42.) In addition to sexual comments, Doe also was the target of unwanted sexual contact by Lollar and Baez. (ECF No. 30 at ¶ 50.) Although Officer Doe repeatedly asked both men to stop, they remained undeterred. (ECF No. 30 at ¶ 50.)

In the summer of 2014, Lollar raped Doe twice. (ECF No. 30 at ¶ 51.) After the rapes, Doe requested to be placed on a different weekend shift so she would not have to work alone with Lollar. (ECF No. 30 at ¶ 52.) She explained to Lieutenant Dercole that she did not feel safe with Lollar. (ECF No. 30 at ¶ 52.) Dercole granted Doe's request for the scheduling change but did not ask any follow-up questions. (ECF No. 30 at ¶ 52.)

In the fall of 2016, Lollar raped Doe again. (ECF No. 30 at ¶ 53.) In November 2016, Doe reported to Lieutenant Dercole that she had been sexually assaulted by a co-worker. (ECF No. 30

at ¶ 55.) Because she feared retaliation, she asked Dercole to keep the matter confidential. (ECF No. 30 at ¶ 55.) Doe declined to name her assailant. (ECF No. 30 at ¶ 55.) Dercole did not refer her to a Title IX Coordinator or any other resource. (ECF No. 30 at ¶ 55.) Dercole notified Police Chief Sneed of Doe's report. (ECF No. 30 at ¶¶ 55, 109.) But no investigation was conducted. (ECF No. 30 at ¶ 109.)

Doe alleges that "upon information and belief, [Lieutenant] Cervoni was also informed of Doe's reports of sexual assault. There were only two lieutenants in the entire CCSU Police Department: Lieutenants Dercole and Cervoni. They both worked first shift, interacted frequently, and regularly attended leadership meetings with the Chief in which they discussed matters of significance to the Department. It is reasonable to infer that Chief Sneed and/or Lieutenant Dercole informed Lieutenant Cervoni about Officer Doe's report that she had been raped by a co-worker." (ECF No. 30 at ¶ 57.)

A female department employee reported to CCSU's Office of Diversity and Equity ("ODE") that Lollar had made sexualized comments about her breasts. (ECF No. 30 at ¶ 58.) He also touched her breast and in another incident, put her hand on his exposed penis. (ECF No. 30 at ¶ 59.) The female department employee notified the ODE that a female student worker told her that Lollar was following her around and staring at her buttocks. (ECF No. 30 at ¶ 60.) The female department employee reported the student worker's concern about Lollar to Lieutenant Cervoni, who brushed it off and took no corrective action after learning of Lollar's sexually harassing behavior. (ECF No. 30 at ¶ 60.) He responded that Lollar "is checking on you." (ECF No. 30 at ¶ 61.) The female department employee told the ODE that Lollar was not the only one responsible for the hostile work environment in the department. (ECF No. 30 at ¶ 62.) She described being

3

stared at in a sexual manner by several other officers, including Sergeant Baez. (ECF No. 30 at ¶ 62.)

After Doe reported the sexual assaults to Lieutenant Dercole, she suffered increased harassment and retaliation by her fellow officers, especially Baez. (ECF No. 30 at ¶ 63.) Doe frequently was subjected to tactics known as "bogarting" and "gaslighting." (ECF No. 30 at ¶ 64.) Officers "bogarted" Doe by usurping her authority and making decisions for her when she was the first on the scene of an incident. (ECF No. 30 at ¶ 64.) "Bogarting" prevented "her from developing and demonstrating her leadership capabilities and from gaining the experience she needed to be considered for promotion." (ECF No. 30 at ¶ 64.) Sergeant Baez and another sergeant, Oliveira, also "gaslighted" Doe by criticizing her reports, demanding specific changes, and then, when she made the specified changes, acting as if they had never asked for the changes in the first place and criticizing her for making them. (ECF No. 30 at ¶ 65.) The reports of Doe's partner, a male, had never been criticized in this manner. (ECF No. 30 at ¶ 65.) He was so disturbed by the "gaslighting" to which Doe was subjected that he helped Doe complete her reports. (ECF No. 30 at ¶ 65.) Even though his reports had never been criticized, the ones he helped Doe write – and to which she signed her name – were met with the same derision from the sergeants. (ECF No. 30 at ¶ 65.)

Doe told Lieutenant Cervoni about Sergeant Oliveira's gaslighting of her. (ECF No. 30 at ¶ 66.) Cervoni's "investigation" consisted of speaking with Oliveira, who denied the accusation. (ECF No. 30 at ¶ 66.) Cervoni then told Doe that Oliveira had done nothing wrong but that he would "keep an eye out concerning her claims of gaslighting." (ECF No. 30 at ¶ 66.) Cervoni's conversation with Oliveira did not deter the gaslighting to which Doe was regularly subjected.

(ECF No. 30 at ¶ 67.)  Discouraged, Doe did not make any further complaints about gaslighting.  (ECF No. 30 at ¶ 67.)

In addition, several male officers, including Lollar, endangered Doe when she was alone in the field by delaying their response to her requests for back-up and on at least two occasions, failing to respond to all.  (ECF No. 30 at ¶ 68.)

Sergeant Baez further retaliated against Doe by separating her from her longtime partner whom she trusted.  (ECF No. 30 at ¶ 69.)  When Doe asked for an explanation - noting that no other paired officers had been separated - Baez merely said something like "Because I said so." (ECF No. 30 at ¶ 69.)

Throughout the fall of 2017, Lollar's sexual harassment of Doe intensified in nature and frequency.  (ECF No. 30 at ¶ 70.)  Because she was without a partner, she feared it was only a matter of time before Lollar would rape her again.  (ECF No. 30 at ¶ 70.)  She reported to the ODE the sexual harassment to which she, her fellow female police officer, and female students were being subjected.  (ECF No. 33 at ¶ 71.)  She also told the ODE that Lollar had raped her on multiple occasions.  (ECF No. 30 at ¶ 71.)  CCSU suspended Lollar with pay until he was terminated a year later.  (ECF No. 30 at ¶ 72.)

After Doe's report to the ODE, the department's targeting of her intensified.  (ECF No. 30 at ¶ 86.)  Sergeant Baez, a close friend of Lollar's, frequently wrote Doe up for small issues and sought to shame her in front of her colleagues.  (ECF No. 30 at ¶ 86.)  In spring 2018, Baez, Oliveira, and Cervoni showed the department a video of Doe's response to an incident, shaming her for her work in the situation.  (ECF No. 30 at ¶ 86.)  On another occasion, Baez berated Doe in front of her partner for her report and threatened "You're out there on your motherf******g own!"  (ECF No. 30 at ¶ 87.)  In response to this threat to her physical safety, Doe immediately

5

emailed Cervoni and asked to speak with him about Baez. (ECF No. 30 at ¶ 88.) Cervoni told her to come to his office. (ECF No. 30 at ¶ 88.) When Doe arrived, Baez was already there, laughing with Cervoni. (ECF No. 30 at ¶ 88.) Doe asked whether they had discussed the incident and Cervoni said they had. (ECF No. 30 at ¶ 88.) Baez remained and Cervoni insisted that Doe lead the meeting. (ECF No. 30 at ¶ 89.) Doe told Cervoni that Baez yelled and cursed at her loud enough for her partner and even some students to hear and that she did not feel comfortable with his conduct. (ECF No. 30 at ¶ 89.) Cervoni responded that all officers curse sometimes. (ECF No. 30 at ¶ 89.) Baez denied swearing at Doe and responded with a threat in sum and substance that he "could put a whole bunch of stuff" in her record "that [she] don't know." (ECF No. 30 at ¶ 90.) Cervoni did not interview Doe's partner or the students to determine what they saw or heard. (ECF No. 30 at ¶ 91.) He did not discipline Baez. (ECF No. 30 at ¶ 91.)

Baez continued to retaliate against Doe. (ECF No. 30 at ¶ 92.) He watched video footage of her work and criticized her about small tasks - things he was aware of only because of his video-assisted scrutiny. (ECF No. 30 at ¶ 92.) He also showed up on her beat to observe her. (ECF No. 30 at ¶ 91.) Because he had separated Doe from her partner, she often was alone when Baez arrived and she was afraid to be in isolated locations with him. (ECF No. 30 at ¶ 92.) As the retaliatory conduct continued, Doe's health deteriorated. (ECF No. 30 at ¶ 93.) In July 2018, Doe took FMLA leave. (ECF No. 30 at ¶ 95.) Doe has been on leave from the department without pay, unlike Lollar, whose leave was paid until he was terminated. (ECF No. 30 at ¶ 73.)

An investigation in 2018 by the law firm Shipman & Goodwin LLP concluded that there were "serious shortcomings" by CCSU's police department in the handling of Doe's report of sexual assault. (ECF No. 30 at ¶ 101.) The report confirmed that no action was taken to investigate Doe's claims, report the matter to the ODE, or protect her from her assailant. (ECF No. 30 at

6

¶ 101.) The report further found that the department hired and retained officers, including Lollar, who had "red flags" in their backgrounds; had a "fraternity-like environment" in which inappropriate behavior was the norm; failed to "take seriously sexual harassment prevention and other trainings regarding diversity and equity topics;" and failed to take disciplinary action against Lollar after it was put on notice that he made sexually charged comments to Officer Roe, the only other female officer. (ECF No. 30 at ¶ 99.)

## II.  LEGAL STANDARD

To withstand a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The plausibility standard is not a probability requirement; the pleading must show, not merely allege, that the pleader is entitled to relief. *Id.* "Although allegations that are conclusory are not entitled to be assumed true, . . . [w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Lynch v. City of New York*, No. 18-1247-CV, 2020 WL 1036620, at *5 (2d Cir. Mar. 4, 2020) (internal quotation marks and citations omitted). "The court must also 'construe all reasonable inferences that can be drawn from the complaint in the light most favorable to the plaintiff.'" *Id.* (citation omitted).

## III.  DISCUSSION

### A.  Cervoni

In count 13, Doe alleges that Cervoni violated her "clearly-established right" under the

Equal Protection Clause to be free from sexual harassment. (ECF No. 30 at ¶ 197.) Defendant Cervoni moves to dismiss this claim on the grounds that Doe has not pleaded sufficient facts to show his personal involvement, and that he has qualified immunity. Specifically, Cervoni argues that Doe fails to allege that Cervoni was aware of the alleged misconduct and that Doe "is attempting to hold [him] liable on the basis of chain of command alone . . . ." (ECF No. 29-1 at 14.)

"Individuals have a clear right," protected by the Fourteenth Amendment right to equal protection, "to be free from discrimination on the basis of sex in public employment." *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 117 (2d Cir. 2004). Under § 1983, an individual defendant may be held liable only if he was "personally involved" in the deprivation of the plaintiff's rights. *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995). The personal involvement of a supervisory defendant may be shown by evidence that:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of [the plaintiff] by failing to act on information indicating that unconstitutional acts were occurring.

*Id.*

Doe argues that Cervoni was personally involved in the alleged constitutional deprivations under the second, fourth, and fifth *Colon* factors by failing to investigate or remedy complaints about sex discrimination. (ECF No. 43 at 39.) I agree. Accepting all the factual allegations in the Amended Complaint as true and drawing all reasonable inferences in Doe's favor, Doe has pled sufficient facts to state a plausible claim of supervisory liability based on Cervoni's inaction in response to information indicating that unconstitutional acts were occurring. Further, because

Doe's right to be free from gender-based discrimination and sexual harassment was clearly established and because reasonable officers would agree that the discrimination and harassment allegedly perpetrated against her violated that right, Cervoni does not have qualified immunity, at least at the pleadings stage. *See, e.g. Raspardo v. Carlone,* 770 F.3d 97, 114 (2d Cir. 2014) ("Public employees have a clear right, protected by the Fourteenth Amendment, to be free from discrimination on the basis of sex in public employment. We have held that the Equal Protection Clause protects such employees from sex-based workplace discrimination, including hostile work environments and disparate treatment."); *White v. Department of Correctional Svcs.*, 814 F. Supp.2d 374, 394 (S.D.N.Y. 2011)("The right to be free from gender discrimination was clearly established at the time of the incidents in question.").

When the allegations in the complaint are construed in favor of the plaintiff, and all reasonable inferences drawn in her favor, the complaint sets forth the following narrative with respect to Cervoni. The police department was a "good old boys" network and a "fraternity-like environment" in which officers regularly made repeated, graphic references to the breasts and buttocks of female students, including at daily roll call and other occasions in the plaintiff's presence. (ECF No. 30 at ¶¶ 32, 99.) When she was hired, the plaintiff was the only woman on a police force of twenty-eight officers, and it had been four years since the department had hired a female officer; it would be another four years before the department hired a second. (Id. at ¶ 31.) Lieutenant Dercole, who, with Lieutenant Cervoni, was one of two lieutenants in the department and worked the same shift as Cervoni (id. at ¶ 57), witnessed officers making sexual comments about women while they were on the beat but never did or said anything to stop them; he himself made a sexual comment about a female student while in the plaintiff's presence. (Id. at ¶ 36.) The plaintiff, too, was a target of these sexual comments, especially by Officers Lollar and Baez, and

9

Dercole, along with Lollar and Baez, who would stare at her buttocks and snicker. Dercole also ignored a complaint of harassment by the second female officer hired, Officer Roe, who complained in the fall of 2017 that Lollar had harassed her in front of Baez. (Id. at ¶ 42.)

A female department employee (not the plaintiff and apparently not the second female officer hired) reported to Cervoni that a female student had informed her that Lollar was following her around and staring at her buttocks. Cervoni brushed off the report, saying only "[Officer Lollar] is checking on you." (Id. at ¶ 61.)

In November 2016, the plaintiff informed Dercole that she had been sexually assaulted by a co-worker, but asked him to keep the matter confidential lest she face retaliation. She did not identify her assailant. Dercole told Chief Sneed, who merely asked the plaintiff if she had anything to tell him. After she responded in the negative, no further action was taken. (Id. at ¶¶ 55-56.) After she made the report, however, the plaintiff faced retaliation. Sergeants Baez and Oliveira, for example, "gaslighted" her by criticizing her written reports, demanding changes, and then, after she made the changes, acting as if they had not asked for the changes and criticizing her for making them. The plaintiff's partner on the force, a male, was disturbed by this conduct and began helping her to complete incident reports; although his reports had never been criticized, the reports he prepared for the plaintiff – to which she signed her name – met the "same derision from the sergeants." (Id. at ¶ 65.) The plaintiff reported all this to Lieutenant Cervoni (id. ¶ 66) and it is a reasonable inference from the allegations that her report included not only that Baez and Oliveira were "gaslighting" her, as described above, but also that they were singling her out and treating her differently from male officers, as suggested by the allegation about the reception of the reports ghost-written by the plaintiff's partner. Cervoni performed a cursory investigation and told her that he saw no issue but would "keep an eye out concerning her claims of gaslighting." (Id.) The

gaslighting continued, and Cervoni's feeble response to the plaintiff's report discouraged her from complaining about it again. (Id. ¶ 67.)

In November 2017, the plaintiff reported to CCSU's ODE that Officer Lollar had raped her on multiple occasions. (Id. ¶ 71.) Thereafter, the retaliation became worse. Baez wrote her up for small issues, and sought to shame her in front of her colleagues, for example, highlighting mistakes on a ticket she had issued and leaving the highlighted mistakes on a table where it could be seen by everyone in the department. On another occasion, in April or May 2018, Baez, Oliveira, and Lieutenant Cervoni showed members of the department a video of the plaintiff's response to a student's 2016 suicide attempt, "shaming her for her work on the incident." (Id. ¶ 86.)

Baez also verbally abused the plaintiff and threatened her physical safety. On one occasion, he berated her – in front of her partner – for the content of a report she wrote involving a student under the influence of drugs. He screamed at her, "You're out there on your m*****f***ing own!" In this case, the plaintiff immediately emailed Cervoni and asked to speak with him about Baez. When she arrived in Cervoni's office, Baez was already there, laughing with Cervoni. Cervoni told her that they had already discussed the incident, and made her lead the meeting. She told him about Baez's comment and that she did not feel comfortable with his conduct. Cervoni brushed it off, stating that all officers curse sometimes. In Cervoni's presence, Baez then threatened her that he "could put a whole bunch of stuff in your record that you don't know." Cervoni did nothing and did not seek to learn more about the underlying threat to her physical safety.

Although the allegations against Cervoni are not as serious as those against several other defendants, there is enough in this narrative to nudge the Equal Protection claim against him across the line of plausibility. Viewed together, the plaintiff's status as the lone, and later one of two,

11

female officers in the department, the prevalence of the sexual banter and the "fraternity-like atmosphere" in the modest-sized department in which Cervoni was one of only two lieutenants – including sexual comments made at roll call –, the report to Cervoni of Oliveira's and Baez's "gaslighting" of the plaintiff, which, it may be inferred, included information making it clear that she was being singled out due to her gender, the "shaming" incident in which Cervoni participated together with Baez and Oliveira, and Cervoni's brushing off of reported misconduct by Lollar and Baez, including Baez's threats against the plaintiff, are sufficient to state a claim that Cervoni was aware that the department fostered a "boys' club" atmosphere and that Baez in particular was discriminating against, harassing, and threatening the plaintiff on account of her gender. These allegations make out a claim that Cervoni was at least deliberately indifferent to the plaintiff's right to be free from discrimination and a hostile work environment and grossly negligent in supervising subordinates who committed wrongful acts. *See Raspardo*, 770 F.3d at 116 (Gross negligence is "the kind of conduct where the defendant has reason to know of facts creating a high degree of risk of . . . harm to another and deliberately acts or fails to act in conscious disregard or indifference to that risk.") [2]

Under these circumstances, Cervoni is not entitled to dismissal on grounds of qualified immunity either. A motion to dismiss based on the affirmative defense of qualified immunity defense faces a "formidable hurdle." *McKenna v. Wright*, 386 F.3d 432, 434 (2d Cir. 2004). *See Collins v. Ferguson*, 804 F.Supp.2d 134, 140–41 (W.D.N.Y. 2011)("[I]t is very difficult for such

---

[2] To the extent that Doe argues that it was plausible that Cervoni "was aware" that Doe had been raped by a co-worker in 2016, which she premises on her allegation in ¶ 57 of the amended complaint, *see* ECF No. 43 at 39 – 40, I disagree. Without additional factual allegations suggesting that Sneed or Dercole informed Cervoni about Doe's report of sexual assault, her allegation in ¶ 57 that Cervoni knew about the assault because he and Dercole "worked first shift, interacted frequently, and regularly attended leadership meetings with the Chief" does not cross "the line from conceivable to plausible." *Iqbal*, 556 U.S. at 680 (quoting *Twombly*, 550 U.S. at 570).

a defense to succeed at the pleading stage" given the "fact specific inquiry" involved). As noted, the right to be from sex discrimination, including a hostile work environment, is clearly established, and when the facts are construed in the plaintiff's favor, as discussed above, no reasonable officer would disagree that Cervoni's conduct – including ignoring threats by his subordinate against a junior officer, threats that Cervoni knew or should have known sprang from sex-based animus – was illegal.

**B.     CCSU**

    **1.     Title IX**

In Counts 1 – 3, Doe alleges hostile work environment, deliberate indifference, and retaliation in violation of Title IX, 20 U.S.C. § 1681 *et seq*. as to CCSU. Defendant CCSU argues that these claims fail because employment discrimination claims are not cognizable under Title IX. I disagree.

"Title IX prohibits sex discrimination by recipients of federal education funding." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173 (2005). The statute provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Defendants do not dispute that CCSU receives federal funds; nor do they argue that CCSU's police department is excluded from the statute's coverage on the ground that it is not an "educational program or activity." Instead, they argue that Title VII provides the plaintiff's sole remedy for employment discrimination.

Whether Title IX provides employees of federally-funded education programs a private right of action against employment discrimination or whether Title VII provides the only such remedy is unsettled in the Supreme Court and the Second Circuit. Other federal courts of appeal

are divided. The First, Third, and Fourth Circuits have concluded that plaintiffs may pursue a lawsuit under Title IX for employment discrimination notwithstanding the availability of a Title VII remedy. *See Doe v. Mercy Catholic Med. Ctr.*, 850 F.3d 545 (3rd Cir. 2017); *Preston v. Commonwealth of Virginia ex rel. New River Community College*, 31 F.3d 203 (4th Cir. 1994); *Lipsett v. Univ. of Puerto Rico*, 864 F.2d 881 (1st Cir. 1988).[3] These courts are persuaded that employment discrimination actions are within the scope of Title IX based on the statute's broad language covering any "person" alleging discrimination, its legislative history, and Supreme Court precedent including *Cannon v. University of Chicago*, 441 U.S. 677 (1979), *North Haven Board of Education v. Bell*, 456 U.S. 512 (1982), and *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167 (2005). On the other hand, the Fifth and Seventh Circuits have concluded that Title IX does not provide a private right of action for employment discrimination. *See Waid v. Merrill Area Public Schools*, 91 F.3d 857 (7th Cir. 1996) *abrogated on other grounds by Fitzgerald v. Barnstable Sch. Comm.,* 555 U.S. 246 (2009), *Lakowski v. James*, 66 F.3d 751 (5th Cir. 1995). These courts are persuaded that Title VII provides the exclusive remedy for employment discrimination claims because, in their view, Title VII is a more detailed statute that preempts Title IX, a more general statute. They reason that allowing a private Title IX claim to proceed would "disrupt" Title VII's "carefully balanced remedial scheme for redressing employment discrimination," including its exhaustion requirements. *Lakoski*, 66 F.3d at 754.

As noted, the Second Circuit has not yet determined whether there is a private right of action for employment discrimination under Title IX. *See Summa v. Hofstra Univ.*, 708 F.3d 115,

---

[3] The U.S. Department of Justice also recognizes such a cause of action. *See* U.S. Dep't of Justice, Title IX Legal Manual IV.B.2. *See* http://www.justice.gov/crt/about/cor/coord/ixlegal.php ("The Department takes the position that Title IX and Title VII are separate enforcement mechanisms. Individuals can use both statutes to attack the same violations.")

131 n.1 (2d Cir. 2013) (declining to "address . . . whether there is a private right of action for employment discrimination under Title IX"). District courts in the Circuit have divided over the issue.[4]

Because the issue of whether Title IX provides an additional avenue for a plaintiff to assert an employment discrimination claim has been thoroughly examined in scholarly opinions, I will not repeat that discussion here. After careful consideration, I find that Doe's Title IX claims are cognizable and not foreclosed by Title VII for substantially the reasons set forth in *Doe v. Mercy Catholic Med. Ctr.,* 850 F.3d 545, 549, 564 (3d Cir. 2017), *Hauff v. State Univ. of New York*, No. 18CV7256, 2019 WL 6498256, at *8 (E.D.N.Y. Dec. 3, 2019), and *Kohlhausen v. SUNY Rockland Cnty. Coll.*, 2011 WL 1404934 at *9 (S.D.N.Y. Feb. 9, 2011) *abrogated on other grounds by Leitner v. Westchester Cmty. Coll.*, 779 F.3d 130 (2d Cir. 2015). Accordingly, CCSU's motion to dismiss counts 1 – 3 is denied.

## 2.   Duplicative Claims

CCSU argues in the alternative that even if Title IX permits an employment discrimination action, Doe's Title IX claims should be dismissed because they are "duplicative" of her Title VII claims in that "they are based on the same operative facts, seek the same relief, and are reviewed under the same legal standard." (ECF No. 34-1 at 3-4.) I disagree. Doe makes clear that she does not seek the same relief under her Title IX and Title VII claims. In particular, she points out that "the egregious conduct to which [she] was subjected" may give rise to damages beyond Title VII's

---

[4] Compare *Hauff v. State Univ. of New York*, No. 18CV7256, 2019 WL 6498256, at *6 (E.D.N.Y. Dec. 3, 2019)(plaintiff may assert an employment discrimination claim under Title IX); *Pejovic v. State Univ. of New York at Albany*, No. 117CV1092, 2018 WL 3614169, at *4 (N.D.N.Y. July 26, 2018)(same), with *Gayle v. Children's Aid Coll. Prep Charter Sch.*, No. 18 CIV. 9874 (GBD), 2019 WL 3759097, at *6 (S.D.N.Y. July 29, 2019) ("Title VII provides the exclusive remedy" for employment discrimination claims); *Philpott v. New York*, 252 F. Supp. 3d 313, 319 (S.D.N.Y. 2017)("employment discrimination claims are not actionable under Title IX").

statutory cap.[5] (ECF No. 60-1 at 7.) Because she seeks different remedies, I decline to dismiss Doe's Title IX claims on the grounds that they are duplicative of her Title VII claims.

### 3. CFEPA

CCSU also moves to dismiss Doe's CFEPA claims in counts 19, 20, and 21 on the grounds that they are barred by the Eleventh Amendment. (ECF No. 34-1 at 4.) Does concedes that they are, *see* ECF No. 43 at 21 n. 1., and I agree. CCSU's motion to dismiss counts 19 – 21 is GRANTED.

## IV. Conclusion

For the foregoing reasons, Cervoni's motion to dismiss count 13 is DENIED and CCSU's motion to dismiss as to counts 1, 2, and 3 is DENIED and GRANTED as to counts 19, 20, and 21.

IT IS SO ORDERED.

_____/s/_____
Michael P. Shea, U.S.D.J.

Dated:      Hartford, Connecticut
            March 11, 2020

---

[5] Title VII has a statutory cap for compensatory and punitive damages based on the size of the employer. 42 U.S.C. § 1981a(b)(3)).